# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**GEORGE COOKS**                                    **CIVIL ACTION**

**VERSUS**                                          **NO. 14-0748**

**N. BURL CAIN, WARDEN LSP**                        **SECTION "S"(4)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* U.S.C. § 2254(e)(2) (2006).[1] For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

## I.    Factual and Procedural Background

The petitioner, George Cooks ("Cooks"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On May 28, 1992, Cooks was indicted by a Grand Jury in Orleans Parish for the first degree murder of Arnold Morris.[3] Another man, Ernest Allen

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, or that the claim relies on a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2] Rec. Doc. No. 1-1.

[3] St. Rec. Vol. 1 of 6, Grand Jury Return, 5/28/92. The indictment listed his name as "George Cook a/k/a Lawrence Kelly" but it was later clarified that George Cooks is his true name. *See* St. Rec. Vol. 3 of 6, Motion to Suppress Identification, 11/30/92, p. 17. His co-defendant, Ernest Allen was also charged by the same bill of indictment, which listed him as "Ernest Allen a/k/a Michael Hayes."

("Allen"), was also charged with the same offense, on the same bill of indictment.[4]  Cooks entered

a plea of not guilty to the charge on June 22, 1992.[5]

The record reflects that Arnold Morris ("Morris") was the victim of a drive-by shooting

which occurred at approximately 5:00 p.m. on Sunday, March 29, 1992, in the 900 block of

Josephine Street in New Orleans, Louisiana.[6]

Theodore Wesley was with Morris at the time of the shooting.  Wesley left his aunt's house

at 5:00 p.m. and was riding his bicycle when he saw Morris pass by him in a truck.  Wesley grew

up with Morris and they knew each other from the neighborhood.  Morris stopped to pick Wesley

up, but remained in the cab of the truck.  As Wesley was putting the bicycle in the back of Morris'

truck, a slow moving truck approached them.  Wesley saw Cooks and Allen hanging out of the

passenger window of the truck.  As Cooks and Allen approached Wesley and Morris, they began

shooting at them. Wesley knew Cooks and Allen from school, but he could not see who was driving

the truck.  Morris attempted to escape the gunfire by driving away, but struck a light pole. The truck

with Cooks and Allen then pulled up near Morris' truck and shot at him again.  The next thing

Wesley remembered was speaking with the police at the hospital.

Wesley  recalled telling a police officer at the hospital that Cooks and Allen shot him and

Morris.  He later identified them in a photographic lineup when police interviewed him at his home.

Wesley also testified that his cousin, Charles Gatson, was coming from a nearby apartment

complex's courtyard when the shooting occurred.

---

[4] *Id.*

[5] St. Rec. Vol. 1 of 6, Minute Entry, 6/22/92.

[6] The facts were taken from the opinion of the Louisiana Fourth Circuit Court of Appeal on direct appeal. *State v. Allen*, 661 So. 2d 1078 (La. App. 4 Cir. 1995).

When the police arrived at the scene of the crime, no victims or witnesses were present.  The officers were advised by the police dispatcher that the victims had been taken to Charity Hospital. The officers then went to the hospital where Officer Gross spoke with Wesley who gave him the names of the shooters.  Officer Gross also observed Morris' truck while at the hospital and noted gunfire damage to the vehicle.

Officer Paulette Pitts Owen was already at Charity Hospital on another matter when the shooting victims arrived.  Officer Owen was then assigned to cover the shooting incident. She observed shattered windows and bullet holes in the truck that brought Morris to the hospital.  Morris was laying in the back of the truck and had multiple gunshot wounds.  Wesley was transported to the hospital in another vehicle. Officer Owen wrote out the police report, although she did not interview the victims and the information in the report was relayed to her by another officer. She did not recall who gave her the description of the assailants' truck, which was listed in the report as "white."

Detective Marco Demma of the New Orleans Police Department Homicide Division initially investigated the scene of the shooting.  At the scene he found eight empty 9mm cartridge casings, a bullet, a spent bullet, a jacket fragment and blood stains.  However, no weapons were recovered. The homicide investigation was later transferred to Detective Jerry London.

At Charity Hospital, Dr. Beblieux treated Wesley, who sustained several gunshots wounds, including a graze wound to the left cheek, a wound to the left armpit, a chest wound, a wound to the scrotum, a wound to the right lower leg, and a wound which broke Wesley's spine in two places. Wesley was conscious and in pain, and only a single wound was non-life threatening. Dr. Deblieux testified that it was possible Wesley was in a state of shock after the shooting.

Two different weapons were used in the shooting.  Morris sustained one shotgun wound and two gunshot wounds. The shotgun wound was the lethal injury, entering in Morris' chest cavity. The two nonlethal gunshot wounds were in his legs.

Upon arrival at Charity Hospital, Detective London viewed Morris' truck and noted four bullet holes in the driver's side of the truck.  A pellet was recovered from the floor of the truck, and London observed blood in the bed of the truck.  About a week later, at Wesley's home, London conducted the photographic lineups of Cooks and Allen.  Wesley identified Cooks and Allen as the perpetrators. A photographic lineup was also conducted with Charles Gatson, Wesley's cousin, but he was unable to make an identification.   London then arranged for the arrest warrants for Cooks and Allen. The police also received information from a Crimestoppers call identifying Cooks and Allen as the shooters.

Cooks and Allen were tried before a jury on March 21 and March 22, 1994, and were both found guilty as charged of first degree murder.[7]  On August 5, 1994, the Trial Court denied Cooks' motion for a new trial, and sentenced him to serve life imprisonment without the benefit of parole, probation, or suspension of sentence.[8]

On direct appeal, Cooks' counsel asserted four errors: (1) the Trial Court erred in denying Cooks' request for a delay after his motion for new trial was denied; (2) the Trial Court erred in denying Cooks' motion to amend the indictment to delete an alias, denying the motion for mistrial based on the prosecutor's two references to the alias during opening statement, and denying the motion for mistrial based on references made by a prospective juror regarding alleged threats, which

---

[7] St. Rec. Vol. 1 of 6, Minute Entry, 3/21/94; St. Rec. Vol. 1 of 6, Minute Entry, 3/22/94; St. Rec. Vol. 1 of 3, Trial Transcript, 3/21/94; Trial Transcript, 3/22/94.

[8] St. Rec. Vol. 1 of 6, Minute Entry, 8/5/94.

resulted in Cooks' bad character being put at issue from the outset of the case and Cooks being

denied a fair trial; (3) the jury erred in determining that there was sufficient evidence to find beyond

a reasonable doubt that Cooks was guilty of first degree murder; and (4) any error patent on the

record.[9]

The Louisiana Fourth Circuit affirmed Cooks' conviction and sentence on September 15,

1995.[10]  The Court of Appeal found that while the Trial Court did err in proceeding to sentence the

defendants immediately after denying Cooks' motion for a new trial, rather than waiting for twenty-

four hours thereafter, the error was harmless "as the sentence to be imposed was mandatory life

imprisonment at hard labor without benefit of probation, parole or suspension of sentence."[11]  The

Fourth Circuit further found that Cooks' other assignments of error were without merit.[12]

On February 2, 1996, the Louisiana Supreme Court denied without reasons the writ

application filed by Cooks' counsel.[13]

However, prior to his direct appeal, which was handled by the Orleans Parish Indigent

Defender Program, Cooks filed a pro se motion for a new trial based on newly discovered evidence

---

[9] St. Rec. Vol. 2 of 6, Appeal Brief, 11/29/1994; St. Rec. Vol. 2 of 6, Supplemental Appeal Brief (undated). The third and fourth errors were asserted in the Supplemental Appeal Brief.  Because Cooks' co-defendant, Allen, also raised a sufficiency of the evidence argument, and the court addressed the errors patent finding that there was one (failure to delay sentencing), it is unclear from the record whether the court actually considered Cooks' supplemental brief, which appears undated in the second volume of the State Court Record.

[10] *State v. Allen*, 661 So. 2d 1078 (La. App. 4 Cir. 1995); St. Rec. Vol 2 of 6, 4th Cir. Opinion, 94 KA 1895, 9/15/95.

[11]  *Allen*, 661 So. 2d at 1083.

[12] *Id.* at 1085-87.

[13] *State v. Allen*, 666 So. 2d 1087 (La. 1996); St. Rec. Vol 2 of 6, La. S. Ct. Order, 95-KO-2557.

of an eyewitness.[14]  The Trial Court never heard his motion, so Cooks filed a writ application to the Fourth Circuit Court of Appeal.  On November 10, 1994, the Fourth Circuit granted the writ and remanded the case to the Trial Court for a hearing.[15]

In 1996, after the Trial Court still did not hold the hearing, the Louisiana Supreme Court granted Cooks' writs and ordered the Trial Court to hold a hearing on the pending motion for new trial.[16] The motion hearing was continued on multiple occasions in 1996 and it was ultimately set without a date.[17]

On July 28, 1998, Cooks supplemented the pending motion for new trial with a supplemental motion for new trial based on newly discovered evidence obtained from the district attorney files.[18] The alleged newly discovered evidence was a supplemental police report containing interviews of two undisclosed witnesses–Denise Robateau and George Soulier–as well as undisclosed statements taken down by police from the State's sole eyewitness, Theodore Wesley.[19]

On October 6, 1998, the Fourth Circuit Court of Appeal granted a writ application filed by Cooks and ordered a hearing be held on his pending motions for new trial in the Trial Court within

_____

[14] St. Rec. Vol. 1 of 6, Motion for New Trial, 5/3/94.

[15] St. Rec. Vol. 1 of 6, Minute Entry, 11/10/94.

[16] St. Rec. Vol. 1 of 6, Minute Entry, 4/1/1996.

[17] *See, e.g.*, St. Rec. Vol. 1 of 6, Minute Entry, 5/3/96; Minute Entry, 5/17/96; Minute Entry 6/14/1996; Minute Entry, 6/28/96; Minute Entry, 7/30/96; Minute Entry, 9/24/96.

[18] St. Rec. Vol. 1 of 6, Minute Entry, 7/28/98; St. Rec. Vol. 1 of 6, Supplemental Motion for New Trial and Petition for Writ of Habeas Corpus Ad Testificandum, 7/28/98.

[19] St. Rec. Vol. 1 of 6, Supplemental Motion for New Trial and Petition for Writ of Habeas Corpus Ad Testificandum, 7/28/98.

thirty days of the order.[20]  On November 20, 1998, the Trial Court finally denied the motion for a new trial.[21]  On February 2, 1999, the Fourth Circuit Court of Appeal denied Cooks' writ application seeking reversal of the Trial Court.[22]  On July 2, 1999, the Louisiana Supreme Court also denied Cooks relief.[23]

However, while his application for a supervisory writ on the matter was still pending before the Louisiana Supreme Court, the Trial Court nullified its judgment denying his motion for a new trial based on a motion filed by counsel that Cooks retained during the interim.[24]  Then, on May 20, 1999, Cooks' counsel filed a post conviction relief application.[25]  The hearings on the motion for new trial and the post conviction relief application were subsequently continued multiple times in the Trial Court, and eventually both were set without a date.[26]

While these matters were pending in the Trial Court for many more years, Cooks obtained a copy of a transcript of a hearing held on a motion for new trial for his co-defendant, Ernest Allen, in which Ms. Robateau, the undisclosed witness, testified.[27]  Based on this testimony, Cooks filed a supplemental petition for post conviction relief on August 4, 2011, asserting that his conviction

---

[20] St. Rec. Vol. 1 of 6, Minute Entry, 10/6/98; 4th Cir. Order, 98-K-2048, 10/6/98.

[21] St. Rec. Vol. 1 of 6, Minute Entry, 11/20/98; St. Rec. Vol. 4 of 6, Criminal District Court, Judgment, 11/20/98.

[22] St. Rec. Vol. 1 of 6, Minute Entry, 2/2/99; St. Rec. Vol. 4 of 6, 4th Cir. Order, 99-K-0022, 2/1/99.

[23] *State ex. rel. Cooks v. State*, 747 So. 2d 10 (La. 1999); St. Rec. Vol. 4 of 6, La. S. Ct. Order, 99-KH-0465, 7/2/99.

[24] St. Rec. Vol. 1 of 6, Minute Entry, 4/28/99; Minute Entry, 5/11/99; Motion to Nullify Judgment, 4/29/99.

[25] St. Rec. Vol. 1 of 6, Minute Entry, 5/20/99.

[26] St. Rec. Vol. 1 of 6, Minute Entry, 6/18/99; Minute Entry, 8/6/99, Minute Entry, 8/12/99; Minute Entry, 9/10/99; Minute Entry, 9/16/99, Minute Entry, 10/19/99, Minute Entry, 10/25/99, Minute Entry, 11/29/99, Minute Entry, 12/22/99; Minute Entry, 1/19/00.  During this time other motions were also filed by defense counsel.

[27] Rec. Doc. No. 1-2, p. 9.

was obtained in violation of the principles of *Brady v. Maryland*, 373 U.S. 83 (1963).[28] The Trial Court subsequently denied Cooks' motion for a new trial/application for post conviction relief on September 9, 2011,  finding that it was procedurally barred pursuant to La. C. Cr. P. Art. 930.8.[29]

Cooks sought supervisory review of this denial in the Fourth Circuit Court of Appeal and on November 23, 2011, the court reversed the ruling, ordering Cooks' motion for post conviction relief and motion for a new trial be considered.[30]  The Fourth Circuit found that because the Trial Court granted a motion for nullity of its denial of relief, but had not conducted a hearing on the 1999 application for post conviction relief/motion for a new trial, the Trial Court's judgment that the supplemental application was time-barred was erroneous.[31]

Following this reversal, Cooks asked that all prior pleadings be amended into one pleading.[32] He also filed an amended supplemental post conviction relief application on February 13, 2012.  The Trial Court held a hearing on his application on April 16, 2012.[33]  On November 13, 2012, the Trial Court entered its judgment denying Cooks' application for post conviction relief and motion for a new trial.[34]  The Fourth Circuit Court of Appeal denied his related writ application on January 17,

---

[28] St. Rec. Vol. 5 of 6, Supplemental Application for Post-Conviction Relief, 8/4/11; St. Rec. Vol. 1 of 6; Docketmaster, 8/8/11.

[29] St. Rec. Vol. 1 of 6, Criminal District Court, Judgment, 9/9/11.

[30] St. Rec. Vol. 1 of 6, 4th Cir. Order, 2011-K-1465, 11/23/11.

[31] *Id.*

[32] St. Rec. Vol. 6 of 6, Amended Supplemental Application for Post-Conviction Relief, 2/13/12.

[33] St. Rec. Vol. 6 of 6, Transcript, Post Conviction Hearing, 4/16/12.

[34] St. Rec. Vol. 6 of 6, Criminal District Court, Judgment, 11/13/12.

2013, finding no error, and the Louisiana Supreme Court also denied Cooks' subsequent writ application without additional stated reasons on January 17, 2014.[35]

## II.   **Federal Petition**

On March 25, 2014, Cooks filed a petition for federal habeas corpus relief.[36]  In his petition, Cooks asserts a single theory for relief: the prosecution obtained his conviction in violation of the principles set forth in *Brady*, and its progeny.[37]  This claim rests on two grounds: (1) the prosecution withheld essential facts, depriving Cooks the opportunity to independently investigate and take advantage of exculpatory evidence; and (2) the prosecution withheld impeachment testimony contradicting the uncorroborated testimony of the sole eyewitness linking Cooks to the crime, thereby undermining confidence in the jury's verdict.[38]

The State filed an answer and memorandum in opposition to Cooks' petition stating that the petition appears to be timely filed, and his claims are properly exhausted.[39] The State argues that Cooks' claims are without merit and that he is not entitled to federal habeas relief.

---

[35] St. Rec. Vol. 6 of 6, 4th Cir. Order, 2012-K-1763, 1/17/13; La. S. Ct. Order, 20123-KH-0379; *State ex. rel. Cooks v. State*, 130 So. 3d 339 (La. 2014).

[36] Rec. Doc. No. 1-2.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." *Roberts v. Cockrell*, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Cooks signed the petition on March 25, 2014, and it was filed into the District Court on March 28, 2014.

[37] *Id.*

[38] *Id.*

[39] Rec. Doc. No. 13.

## III.    General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214,[40] applies to this petition, which is deemed filed in this Court no later than March 25, 2014.[41]  The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes the timeliness of the petition and the exhaustion of remedies of Cooks' claims.  The State also does not raise a procedural default defense and no such defense is apparent from the record.  The Court will proceed to address the substance of Cooks' claims.

## IV.    Standards of a Merits Review

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

---

[40] The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[41] The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 376–78 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Cooks' federal habeas petition on March 28, 2014.  Cooks dated his signature on the form petition on March 25, 2014.  This is the earliest date appearing in the record on which Cooks could have presented to prison officials for mailing to a federal court.

A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA.  The standard provides that deference be given to the state court's decision unless the decision is "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  *Hill*, 210 F.3d at 485.  The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."  *White v. Woodall*, ––– U.S. ––––, 134 S. Ct. 1697, 1706–07 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787 (2011) and *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  *White*, 134 S.Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court

decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405–06, 412–13; *Penry v. Johnson*, 532 U.S. 782, 792–93 (2001); *Hill*, 210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts.  *White*, 134 S. Ct. at 1706–07; *Williams*, 529 U.S. at 406–08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *See Williams*, 529 U.S. at 410.  The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *Id.*  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly."  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002)) (brackets in original) (internal quotation marks omitted); *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24–25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, ––– U.S. –––, 131 S. Ct. 1388, 1398 (2011).

## V.   <u>Essential Facts and Impeachment Evidence Withheld under *Brady*</u>

Cooks' claims both stem directly from the State withholding one document: the supplemental police report.   In relation to the withholding of this report, Cooks argues two bases for *Brady* violations: (1) withholding of essential facts; and (2) withholding of impeachment evidence relating to the State's sole eyewitness, Theodore Wesley.

First, Cooks argues that the prosecution withheld essential facts, specifically relating to the identity of an undisclosed witness, Ms. Robateau, and her statement that the truck the perpetrators fled in was white–rather than grey and black, as described by Wesley at trial–a description that was also included in the incident police report given to Cooks, but without crediting a source.   He contends that withholding this information deprived him of the opportunity to independently investigate and take advantage of exculpatory evidence.   Cooks offers Ms. Robateau's 2009 sworn testimony at his co-defendant's hearing on a motion for a new trial, which identified two different men as the actual perpetrators of the murder, as evidence that had he known of her existence, he could have discovered this exculpatory evidence.[42]   The summary of Ms. Robateau's police interview was included in the undisclosed supplemental police report.

Second, Cooks argues that the failure to disclose the supplemental police report also constituted a *Brady* violation because it contained two summaries concerning statements of Theodore Wesley, the State's sole eyewitness, that contradict his trial testimony.   Because these statements undermine Wesley's credibility as a witness, and his trial testimony constituted essentially the entire case against Cooks, Cooks argues there is a reasonable probability that the jury could have come to a different conclusion–possibly even that Wesley had been coached by the

---

[42] Rec. Doc. No. 1-2.

prosecution–if this information was available to Cooks at trial.  Cooks further argues that a statement of a third witness, George Soulier, which was also only included in the undisclosed supplemental report, further discredits Wesley's testimony.  Soulier stated that he saw a grey and black truck, driven by an "unknown occupant," which Cooks interprets to mean it only contained a single individual, and could have supported a theory that there were two different vehicles: one unrelated grey truck, and one white truck in which the actual assailants fled.

Finally, Cooks argues that all of the undisclosed evidence should be evaluated together for its cumulative effect, which further supports his claim of a constitutional violation under *Brady*.

These claims were raised in post-conviction review before the state courts, and were denied as meritless at each level.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991).  In the last reasoned decision of the state courts, the Trial Court found that Cooks' claims were not supported by the record, and were not of a nature to make a different result reasonably probable, nor undermine confidence in the jury's verdict.[43]

In *Brady*, the Supreme Court required the States to produce exculpatory and impeachment evidence for reasons of due process. 373 U.S. at 87. The *Brady* disclosure requirement applies only to evidence that is exculpatory and material to guilt or that is impeachment evidence favorable to the defense.  *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *Brady*, 373 U.S. at 87.  Claims pursuant to *Brady* involve "the discovery [of evidence], after trial of information which had been known to the prosecution but unknown to the defense."  *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)) (internal quotation marks omitted).

The Supreme Court later extended the *Brady* rationale and held that:

---

[43] St. Rec. Vol. 6 of 6, Criminal District Court, Judgment, 11/13/12.

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.  But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S.) the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

*Brady* and *Kyles* do not, however, place any burden upon the prosecution to conduct the defendant's investigation or assist in the presentation of the defense's case.  *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) (citations omitted); *Bigby v. Cockrell*, 340 F.3d 259, 279 (5th Cir. 2003).  Thus, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim."  *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (holding that *Brady* does not require prosecutors to furnish a defendant with exculpatory evidence if that evidence is fully available to the defendant through an exercise of reasonable diligence); *Rector v. Johnson*, 120 F.3d 551, 558–59 (5th Cir. 1997) (holding that the State has no duty to lead the defense toward potentially exculpatory evidence if the defendant possesses the evidence or can discover it through due diligence).

The Supreme Court, however, made clear that "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles*, 514 U.S. at 436–37. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109–10.

Instead, three factors must be considered to evaluate an alleged *Brady* violation: (1) the evidence at issue must be material, which is favorable to the accused either because it is exculpatory

or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 281–82). Evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433. Moreover, "a reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, ––– U.S. ––––, 132 S. Ct. 627, 630 (2012) (quoting *Kyles*, 514 U.S. at 434).

A claim under *Brady* is a mixed question of law and fact. *Higgins v. Cain*, 434 F. App'x 405, 406 (5th Cir. 2011) (citing *Banks v. Thaler*, 583 F.3d 295, 309 (5th Cir. 2009)). Under the applicable standard of review, this Court therefore must determine if the state court's decision to deny relief was contrary to or involved an unreasonable application of Supreme Court precedent.

The relevant undisclosed evidence in this case boils down to the supplemental police report. As an initial matter, it does not seem that the second prong of *Brady*, regarding suppression by the State, is in dispute. It is clear that the supplemental report was not disclosed by the State–neither voluntarily, nor upon Cooks' request. Thus, this Court agrees that at least one prong of Cooks' *Brady* claim has been satisfied. However, due to the nature of the evidence, as well as its lack of materiality, this Court finds that the Trial Court's decision denying Cooks' claims was neither contrary to nor an unreasonable application of *Brady* and its progeny.

First, this Court will consider the secondary portion of Cooks' argument–that the supplemental report contained favorable, material impeachment evidence in the form of Theodore

Wesley's prior statements.  In order to determine the nature of the evidence (both whether it was favorable, and whether it could be considered material) it is critical to examine the difference between the four statements made by Wesley, specifically, the difference between his three statements in the supplemental report, versus his testimony at trial.  *See Wilson v. Whitley*, 28 F.3d 433, 435 (5th Cir. 1994) (applying a similar analysis).  The statements from the supplemental police report are as follows:[44]

First, in the gist section:

> Witness [Wesley] stated he and victim were in the 900 block of Josephine Street, when they were approached by three negro males, who started shooting at them, for no apparent reason.  Witness further states that the victim was sitting in a truck while he (witness/victim) was sitting on a bicycle on the passenger side of the truck.

Second, in the persons interviewed section:

> Wesley stated that he and the victim were in the 900 block of Josephine, he (Wesley) was sitting on a bicycle on the passenger side of the truck while Arnold was sitting in driver seat of the truck, when they were approached by two black males who began shooting at them.

Third, also in the narrative section:

> Wesley states he was in the 900 block of Josephine St. on a bicycle when the victim Morris Arnold had just stopped along side him in a pick-up truck.  With him (Wesley) on the passenger side of the truck and Arnold still in the driver seat, a black pick-up truck pulled along side of Arnold occupied by three black males that he recognized and named as Ernest Allen, George, and Turon.

Importantly, Wesley did not sign the supplemental report, and there is no evidence that he otherwise adopted these statements as his own.  *See Wilson*, 28 F.3d at 436.  In contrast, however, at trial, on direct examination, Wesley testified as follows:

> Q:     O.K.  Did he [Morris] stop in the middle of the street or did he pull up over the side?

---

[44] St. Rec. Vol. 6 of 6, Supplemental Police Report, 4/16/92.

A:      He pulled over to the side.

Q:      O.K.  And is that the same side of the street that's next to the St. Thomas Housing Project?

A:      Yes.

Q:      O.K.  And what did you do next?

A:      Jumped off the bike and I was about to put it in the back of the truck.

Q:      Then what happened?

A:      That's when a truck came with Ernest Allen and George Cooks shooting.

Q:      O.K.  Did you know Ernest Allen and George Cooks before that day?

A:      Yes.

Q:      How long had you known them?

A:      I know them from school.

Q:      From school.  O.K.  Is it fair to say you knew them both for over a year?

A:      Yes.

Q:      O.K.  And were they both inside this truck or how did it happen that they drove by and they started shooting at you?

A:      Both of them was hanging out the window.

Q:      Which window?

A:      The passenger side.

Q:      O.K.  Was it just those two people in the car or was there someone else?

A:      There was three but I couldn't see the third person.

Q:      O.K.  And how much of their bodies was hanging out of the car?  Was it just their arms or were their upper bodies hanging out?

A:      Their upper bodies.

. . . .

Q:      O.K.  And did you see them firing at you?

A:      Yes.

Q:      O.K.  What first drew your attention or made you notice this truck coming up?

A:      It was moving real slow and it picked up speed.

. . . .

Q:      . . . . And were you able to see how Donny [Morris] got shot?

A:      Yes.

Q:      O.K.  And how was that?

A:      After the truck flew from by me, Donny [Morris] hit the gas pedal.  That's when he ran into the pole.  And that's when the truck stopped on the side of him and started shooting again.

There are discrepancies between the statements, and as Wesley was the only eyewitness for the State, and his testimony essentially constituted the entire case for the State, these discrepancies could be considered favorable to Cooks as impeachment evidence.  *See Wilson*, 28 F.3d at 437.

Accordingly, the next question is whether these discrepancies are material.  As noted above, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433.  And turning to that question, the Court finds that while it may be a close call in this case, the Trial Court's conclusion that the discrepancies did not amount to material evidence under *Brady* was not an unreasonable application of the law.

Here, there is no doubt that Wesley's identification testimony was essential to Cooks' conviction because there was no other corroborating evidence of Cooks' guilt.  *See Wilson*, 28 F.3d at 439.  However, as the Fifth Circuit noted in *Wilson*, which presented similar circumstances to those herein, "of critical importance to our analysis of the materiality of any discrepancies is the manner by which the report was prepared." *Id.* at 440.  Here, just as in the police report in *Wilson*, the supplemental police report represents a summary of the statements as told to the police officers–not a "verbatim transcription" of Wesley's statements.  *See id.*

The first discrepancy between the prior statements and the trial testimony is the number of assailants.  In the first statement, three assailants are described–which is consistent with the third statement, as well as Wesley's trial testimony.  However, in the second statement, Wesley apparently described only two black males approaching.  In the incident report disclosed to Cooks, the description included four perpetrators.  However, this discrepancy, though perhaps exacerbated by the undisclosed statement that there were only two assailants, was generally addressed at trial when Wesley was cross-examined about the incident police report, which stated that there were four assailants.  As the Fourth Circuit noted on direct appeal, that discrepancy could be attributed to

shock.  Insofar as the other statement attributed the actions to "two males" it could be that he was only referring to the shooters in that instance–not the third person who was supposedly the driver.

The second discrepancy is Wesley's position relative to the truck, which Cooks contends changed in his trial testimony in an attempt to establish a better purported angle from which Wesley could have viewed the perpetrators.  In all three statements in the supplemental report, Wesley indicated that he was sitting on a bicycle, on the passenger side of the truck, when the assailants approached.  However, at trial, Wesley instead testified that he "[j]umped off the back and [] was about to put [the bicycle] in the back of the truck."  Although this difference represents a more difficult question, it does not in itself make clear, as Cooks contends, that Wesley changed his story to make it appear that he had a better opportunity to view the assailants.

Cooks also contends the description of the assailants at trial as "hanging out of the window" is undermined by Wesley's earlier undisclosed statements that there were black males "approaching."  Cooks argues that the use of "approaching" supports a theory that the assailants were on foot, rather than hanging out of a truck window.  However, it is simply not clear that the word "approach"–which cannot be verbatim attributed to Wesley–was intended to mean the assailants were on foot.  In addition, the third statement in the supplemental report definitively states that the assailants were driving by in a truck.

Thus, taken as a whole, the supplemental report–made up of statements not adopted by Wesley himself, but rather taken down by police officers on the scene–does not completely contradict or undermine the credibility of Wesley's testimony–especially insofar as his identifications of the defendants, a point on which he never wavered.  It was therefore not unreasonable for the Trial Court to find that the evidence lacked materiality under *Brady*.

Similarly, the statement of George Soulier can hardly be considered material.   The supplemental report, in relevant part, states:

> Employed by L.A. Patrol, [George Soulier] is assigned to the old Redemptorist High School.   Mr. Soulier was interviewed by Detective Wiggington on the scene.   Mr. Soulier stated that he was standing on the downtown side of Constance half block from Josephine St. when he heard 7 to 9 shots.   He then saw a gray and black possible 1977-1979 Chevrolet on Constance headed toward Josephine St. driven by an unknown occupant.   Mr. Soulier further states that the truck appears to be the same truck he has seen in the area before during Mardi Gras when another murder occurred in the same area.

First, it is unclear that this statement is even favorable.   It would tend to corroborate the existence of a gray and black truck, which was exactly how Wesley described the assailants' vehicle at trial. Further, the fact that Mr. Soulier said the truck was "*driven* by an unknown occupant" hardly forecloses the possibility that other people might have been passengers in the car.   Thus, it was not unreasonable for the Trial Court to find that this evidence could not satisfy the elements of *Brady*.

Finally, there is the information regarding Ms. Robateau's existence, and the fact that she was the one who described the truck as white.   Because Ms. Robateau later testified that two other men committed this crime–testimony that is certainly exculpatory–this evidence requires careful consideration.   The portion relevant to Ms. Robateau's interview states:

> Interviewed by Detective Wiggington on the scene, Ms. Robateau stated that she was coming out of the store when she heard several shots and went back in the store.   She saw a truck speeding down the street occupied by an unknown occupants. [sic]   She then took a glance out and saw a man on the ground, she then came out and saw another subject get in the truck.

Thus, when interviewed on the scene that day, Ms. Robateau did not disclose that she had seen the perpetrators, or that she could positively identify them.   Rather, she simply told the cops that she had seen a truck speeding away.   While the description of the truck as "white" may have been useful impeachment evidence, that description was included in the incident police report–and was therefore

21

available to use in cross-examination at trial.  In fact, the supplemental police report does not link that statement to Ms. Robateau, although, as Cooks contends, one might deduce it from a process of elimination.

It was not until fifteen years after the trial that Ms. Robateau decided to share the information that she did not share with police–that two other men allegedly killed Arnold Morris and that she had witnessed them fleeing on March 29, 1992.  This finally came forward in her testimony at the hearing for  Ernest Allen's motion for new trial on June 16, 2009.[45]  Despite the weight of this testimony, the Court cannot impute knowledge of its contents to the State at the time of trial, fifteen years earlier.  There was no reason for the police to know that Ms. Robateau had knowledge of exculpatory evidence which would be favorable to Cooks.  In fact, her own 2009 testimony acknowledges that she did not tell the police that she saw the shooters get out of the truck and recognized them as people she knew from the neighborhood, because she was in fear for her life.[46]

It bears reiterating that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *Agurs*, 427 U.S. at 109–10.  While the choice of Ms. Robateau to withhold her observations from police was an unfortunate choice for Cooks, the Trial Court could reasonably have found that the State did not have a duty to disclose her existence when she did not appear to possess any favorable or exculpatory evidence.  In fact, it appears from the judgment that the Trial Court found her testimony unavailing, as she admitted at the hearing that she

---

[45] St. Rec. Vol. 6 of 6, Transcript of Motion for New Trial for Ernest Allen, 6/16/09.

[46] *Id.* at 20.

did not actually witness the shooting itself.[47]  And, as previously noted, her statement regarding the white truck did make it into the incident police report, which was disclosed.  In sum, despite whatever knowledge Ms. Robateau had in 1992, "*Brady* does not require the government to interview witnesses or otherwise create exculpatory evidence not then in existence."  *United States v. Nguyen*, 98 F. App'x 608, 609 (9th Cir. 2004) (citing *United States v. Monroe*, 943 F.2d 1007, 1011 n.2 (9th Cir. 1991).

The Court notes that the question presented before it is an extremely close one, and that courts and judges could reasonably differ on the proper outcome.  The role of a federal habeas court under the AEDPA, however, is not to review *de novo* the decisions of the Trial Court, or to correct what it finds to be "incorrect" decisions.  Rather, the Court is held to its standards of review under the AEDPA, which in this case requires the Court to simply consider whether the state court unreasonably applied the law.  The Court finds that the Trial Court did not do so in finding that the nondisclosure of Ms. Robateau's existence did not amount to a *Brady* violation.

Finally, Cooks' argument that the cumulative effect of the evidence requires a finding of a *Brady* violation is unavailing.  Taking the evidence together, especially in light of the weak support for the impeachment evidence, does not upend the reasonableness of the Trial Court's decision.  For these reasons, Cooks is not entitled to federal habeas relief on his *Brady* claims.

---

[47] St. Rec. Vol. 6 of 6, Criminal District Court, Judgment, 11/13/12.

VI.    **Recommendation**

For the foregoing reasons, it is **RECOMMENDED** that Cooks' petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[48]

New Orleans, Louisiana, this 9th day of December, 2014.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[48] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

24